# EXHIBIT "C"

MICHAEL K. JEANES
Clerk of the Superior Court
By Trista Shepardson, Deputy
Date 09/30/2016 Time 14:43:33
Description Amount
-------- CASE# CV2016-054549 --------
CIVIL NEW COMPLAINT 319.00
TOTAL AMOUNT 319.00
Receipt# 25506512

Thomas C. Horne No. 002951
**HORNE SLATON, PLLC**
6720 N. Scottsdale Road, Suite 285
Scottsdale, Arizona 85253
(480)483-2178
(480)367-0691
horne@horneslaton.com
*Attorney for Plaintiffs*

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

ERIC LANGAN, an individual; PAUL McNULTY. an individual; PATRICIA QUICK, an individual; STONY POINT FUND, L.P.; a Michigan limited partnership; JEFFREY H. WALLEN, D.D.S., P.C., a professional corporation,

Plaintiffs,

vs.

ARÊTE INDUSTRIES, INC., a Colorado corporation DON PROSSER and JANE DOE PROSSER, husband and wife, and CHARLES DAVIS and JANE DOE DAVIS, husband and wife.

Defendant.

CV CV2016-054549

**COMPLAINT**

**(Misrepresentations)**

Plaintiffs allege:

1. Plaintiffs are all investors in Arête Industries, Inc.

2. Defendant Arête Industries, Inc. ("Arête") is a Colorado corporation. The actions of Don Prosser and Charles Davis were for the benefit of the communities consisting of themselves and their wives, whose true names to be substituted when known.

3. Defendant purposely availed itself of the benefits of the laws of Arizona, including entering into agreements with Paul Pollack, who is a resident of Maricopa County (a fact known to Arête) to help raise capital.
4. Arête's principals (Mr. Prosser and Mr. Davis) visited Arizona specifically related to the meeting with Paul Pollack regarding the matters covered in this Complaint.
5. This Court has personal jurisdiction over Defendants.
6. Plaintiffs purchased stock in Arête for a total of $555,000.
7. Arête's principals, Prosser and Davis prepared a business plan, which served as an offering memorandum for these investments. Under this plan, Davis, who owned significant oil and gas properties, was to convey certain of those properties to Arête. After that representation was made, unknown to the Plaintiffs, Davis sold one half of those properties for $20 million, which was received by him, and was of no benefit to Arête.
8. Prosser and Davis had an agreement between themselves, which was unknown to the investors. Under that agreement, Davis would get 80% of the profits on the sale of the remaining properties. This was never disclosed to the investors, and was omitted from SEC filings.
9. Revenues for the properties were misrepresented to the investors by a factor of two.
10. Other representations made were as follows:
    1. By using a clean shell, they might be able to attract institutional investors.
    2. With a seasoned management team in place, they might be able to attract institutional investors.
        a. A seasoned oil executive such as Charley Davis could boost investor confidence.

b. Don Prosser in a finance role would be able to get SEC required filings done on time and also be able to deal effectively with the financial side of the business.

c. Marketing would have to be done to show institutional investors the potential of this story.

3. The new company would need to raise money for the purchase of the properties.

4. Capital projects such as new oil well drilling would require additional funding beyond the amount raised to initially purchase the assets.

5. Getting the new company listed on a public exchange would enhance the chances for institutional investment in the company and its stock.

6. A board of directors comprised of reputable and well know experts in the oil and gas exploration industry would be recruited.

7. Charles Davis would be the seasoned oil executive that would run the company.

8. Mr. Prosser had a deal with Mr. Davis to purchase the properties at a set price.

9. The price of the properties was $10 million.

10. Charles Davis was motivated to sell the properties to Arête at a discount to the market because he had limited partner investors in his private DNR partnerships that were ready to exit their oil and gas investments.

11. These limited partner investors were at the age that they were no longer willing to reinvest additional capital in new projects with DNR.

12. Charles Davis would be running a new public company with the same assets he had before and be able to take advantage of the potential upside of being a public company.

a. Grow the public company by raising capital in the public equity markets for both asset purchases and capital expenditure projects.

b. Grow his net worth as a large shareholder in the public company.

c. Provide liquidity for his stake in the public company.

13. There were advantages to using Arête as the public shell vehicle as it owned a substantial tax asset from prior net operating losses.

14. In order to utilize the tax asset, Arête had to be the public entity as other strategies such as having a clean shell purchase Arête down the road would not preserve and transfer the tax asset.

15. Existing production of 791 mcf per day of Natural Gas and 98 barrels of oil per day at pricing of $5 per day per mcf of Natural Gas and $80 per barrel of oil per day would yield revenues of $11,000 per day or $4.5 million per year starting in calendar 2010.

16. Prosser also projected steep increases from these figures, which had no reasonable basis in fact.

17. West Texas Intermediate oil prices were in the $85 to $90 range in the 4th quarter of 2010.

18. Arête received greater than $6 per mcf due to higher BTU content and location of production in the same time period.

19. The existing production came from 83 separate wells which were all mature and therefore would have a relatively flat decline curves.

20. Lease operating expenses were approximately 12.5% of revenue.

21. G&A cash expenses were approximately $75K per quarter.

22. Conventional bank financing could easily be obtained once the properties were on Arête's books. This would be used as bridge financing until additional capital raises could be executed.

11. On September 8, 2015, in administrative proceeding number 3 – 16792, the United States Securities and Exchange Commission entered an order finding that Prosser had violated the

Securities Exchange Act of 1934, in an unrelated matter. A copy of that order is attached as exhibit A. For certain purposes, Prosser admitted the allegations. This event caused Plaintiffs to research events in greater depth than previously, and conclude that Defendants had committed actual misrepresentations to the detriment of Plaintiffs other bases for this action:

a. Arête failed to make disclosures, timely SEC filings, or sufficient efforts to secure the value of Arête.
b. Arête is an oil and gas acquisition company but does not abide by any drilling plan.
c. Arête unreasonably failed to meet its economic forecasts.
d. Upon information and belief, shortly after a reverse split, Arête directors sold or filed to sell their Arête shares.
e. Chief Financial Officer Charles Davis through his interests in DNR Oil & Gas sold part of the property that Arête intended to purchase to a third party.
f. Arête failed to close timely its acquisition of oil and gas drilling rights in Wyoming.
g. The failure to close timely cost Arête an additional $1,000,000.
h. Arête failed to comply with corporate formalities.
i. Upon information and belief, Arête failed to seek increased gas or oil production.

12. Also on April 22, 2011 the company announced that Mr. Prosser had been appointed CEO and Mr. Davis had been appointed COO. This was in direct contradiction to what had been previously represented.

a. The problem is that they could not market Mr. Prosser at the helm of an oil and gas exploration company to institutional investors as he did n't have an oil and gas background.
b. Another problem was that Mr. Prosser had recently taken his previous company Iptimize into a messy liquidation and bankruptcy. He has had a prior lawsuit settled through insurance and currently is a Defendant in a second piece of litigation regarding the Iptimize case.
c. A third problem was with VCG Holdings where Mr. Prosser was previously CFO. VCG had previously raised money from Mr. Pollack's institutional book of investors and there was improper conduct in a deal that we now believe was engineered by the former CEO and Mr. Prosser. Mr. Prosser gave erroneous estimates to Wall Street allowing VCG to raise capital at highly inflated stock prices. When the financial were reported, they were nowhere near the estimates that were used to raise the capital.

13. It was represented that Prosser had a deal with Mr. Davis for the purchase of the properties for $10 million.

a. Mr. Prosser and Mr. Davis never had a deal between them for the purchase of the properties by Arête.

b. Mr. Prosser and Mr. Davis negotiated the purchase transaction between themselves. Plaintiffs were excluded from these negotiations. As a result, a transaction that was highly favorable to Mr. Davis was agreed upon. This deal was very different from the transaction that was described to Plaintiffs by Mr. Prosser and Mr. Davis before the capital was raised. The final deal was not favorable for common stock shareholders.

14. The original offering memorandum for the $800K raised speaks about additional compensation due to DNR if certain thresholds for the prices of oil and natural gas are met and if increases in the reserves of oil and gas are recorded by Sure Engineering (independent oil reserve engineers). The cap to this additional compensation was $15 million.

15. A SEC S-1 was filed by Arête that gave greater detail into the final sales contract that was transacted. The cap to the additional transaction is $25 million.

16. Prior to closing the transaction, DNR entered into a sale of some of the properties to a third party around August 20, 2011. Arête gets a credit of $5.1 million for the sale of those properties. The total transaction is supposed to be $18 million where Mr. Davis pockets $13 million. Arête gets override relief for the amount pocketed by Mr. Davis. This was contrary to earlier representations.

17. Lease Operating Expenses ("LOE") are far in excess of Mr. Prosser's projections. These were misrepresentations. For the Q3 quarter ending September 2011, cash lease operating expenses were $185,469 on revenues of $436,734. These LOE expenses are far in excess of the 12.5% expense level given by Mr. Prosser's projections in the offering memorandum.

18. LOE for the quarter ending March 31, 2012 were $283,709 on oil production revenues of $533,048 which is in excess of the 12.5% expense projection given by Mr. Prosser.

Subsequent quarters show a similar trend for the level of LOE expenses. Obviously the LOE projections were misrepresentations, and the failure to perform anywhere near the promises were breaches.

19. G&A expenses for the Q3 quarter ending September 2011 were $289,000 which is far greater than the $75K per quarter expense that Mr. Prosser indicated to before capital was raised. Subsequent quarter G&A expenses have been of similar size to the Q3:2011 quarter.

20. Additional misrepresentations can be viewed from a December 14, 2011 Press Release:

> "The plans and expectations for the Company for the remainder of 2011 and 2012 are as follows:
>
> - Expect the oil and natural gas revenue for the 4th quarter ended December 31, 2011 to be approximately $800,000, *(Q4 revenues From oil and gas sales were $522,746)*
> - Complete a drilling plan for five infill wells in Kansas and three infill wells in Colorado, with the first permit planned for December 2011; *(No wells have been drilled to date)*
> - Completing the negotiations for three properties in Wyoming to be included in a sale, joint venture or a farm-out agreement to develop the property with horizontal drilling; *(Maybe one sale of property was accomplished)*
> - Interviewed and have extended offers to four independent members to the Company's Board of Directors; *(Same Board of Directors today as when this Press Release was issued)*
> - Applied for a $2,000,000 line of credit at a bank; *(No line of credit exists)*
> - Signed a contract to be interviewed on Money TV for the next quarter;
> - Planning to present at three oil and gas conferences in the Spring 2012; *(No conference presentations performed so far)*
> - Expect to earn approximately $0.62 per share in 2012, and; *(Currently they have shown a $0.09 loss through the third quarter 2012)*
> - Continue to pursue additional opportunities for growth of the Company." *(No evidence of pursuit of growth opportunities yet)*

22. In a press release that has subsequently disappeared from the Arête shareholder website (can be found on the PR services website) dated June 1, 2011, it states:

> "Existing Properties Include 90 Operating Wells that Currently Produce 175 BOE per Day and Expects to Close the Year Ending December 31, 2011 at 550 BOE per Day"

*(175 BOE per day turns out to be fiction as does the claim to produce 550 BOE per day by December 31, 2011. It would turn out that Arête would require financing to boost production and Mr. Prosser and Mr. Davis knew that financing would not be forthcoming.)*

23. The misrepresentations set forth above satisfy the nine elements required under Arizona law: 1. A representation; 2. Its falsity; 3. The misrepresentations set forth above or material; 4. Defendants knew of the representations falsity or their ignorance of its truth; 5. Defendants intended that the representations should be acted upon by plaintiffs in the manner reasonably contemplated; 6. Plaintiffs were ignorant of its falsity; 7. Plaintiffs relied on the truth of the representations; 8. Plaintiffs had a right to rely on the truth of the representations; 9. Plaintiffs suffered consequent and proximate injury.

24. The misrepresentations in this case were deliberate, indicating an evil hand guided by an evil mind, justifying punitive damages in an amount sufficient to discourage similar conduct in the future by defendants and others similarly situated.

**THEREFORE**, plaintiffs request damages against defendants, and each of them, in a reasonable amount to compensate them for the injury resulting from the misrepresentations, for punitive damages in an amount sufficient to discourage future conduct by defendants and other similarly situated, for costs incurred, and for such other and further relief as the court deems proper.

**DATED** this 30th day of September, 2016.

**HORNE SLATON, PLLC**

By: [signature]

Thomas Horne, Esq.
*Attorney for Plaintiffs*

# EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 75855 / September 8, 2015

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 3687 / September 8, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16792

| In the Matter of<br><br>Donald W. Prosser, CPA,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |
|---|---|

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Donald W. Prosser ("Prosser" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

## Summary

MusclePharm Corporation ("MSLP") is a Denver-based sports nutrition company that develops, manufactures, and markets sports nutrition products. When MSLP became a public company in 2010, it was unprepared for the Commission's reporting requirements and lacked sufficient infrastructure to support its rapid growth. MSLP's revenues greatly increased each year (MSLP's reported revenue was $3M in 2010, $17M in 2011, $67M in 2012 and $111M in 2013). MSLP's senior management lacked public company or accounting experience. While the company focused on revenue growth, it failed to establish sufficient internal controls and keep proper books and records. From July 2012 through April 10, 2014, Prosser was a member of MSLP's board of directors and chair of the audit committee. Beginning in September 2012, Prosser, the board of directors and members of senior management had reason to know that MSLP had not disclosed certain perquisite compensation paid to its executive officers. Prosser, however, knew or should have known that he signed materially false and misleading filings with the Commission that failed to disclose all perquisites MSLP was required to disclose under the securities laws. By summer 2013, MSLP began an internal review to determine the amount of undisclosed perquisites paid by MSLP to its executives since 2010. In July 2013, Prosser became directly involved in MSLP's internal perquisite review. MSLP nevertheless continued to make filings with the Commission that materially understated perquisite compensation through July 2014.

## Respondent

1. Donald W. Prosser, CPA, age 64, a resident of Denver, Colorado, was a member of the MSLP board of directors from July 2012 through April 10, 2014. As an independent member of the MSLP board of directors, Prosser served as chair of the audit committee, a member of the compensation committee, and a member of the nominating and governance committee. From April 10, 2014 through March 2, 2015, Prosser served as interim chief financial officer ("CFO") of MSLP. Prosser has been licensed as a certified public accountant ("CPA") in Colorado since 1977, except for the three year period from June 1, 1998 to June 26, 2001.

## Relevant Entity

2. MSLP is a Nevada corporation, based in Denver, Colorado, that manufactures and markets sports nutrition products. From 2010 to present, MSLP's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was quoted on the OTC Bulletin Board.

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

**Prosser's Role in MSLP's Executive Compensation Disclosures**

3. In September 2012, according to the MSLP board minutes, Prosser attended a meeting of the MSLP board of directors and compensation committee. During the meeting, the MSLP board of directors determined perquisites related to autos, golf club memberships, and private plane usage would be disclosed in Commission filings. MSLP, however, filed several Commission filings in the form of Forms 10-K and Forms S-1, as well as amendments thereto, through July 2014, which failed to include complete disclosure of the perquisites identified at the September 2012 board meeting and otherwise known by senior management. Prosser signed these filings as a director.

4. On January 4, 2013, Prosser attended a meeting of the MSLP Compensation Committee of the board of directors. During the meeting, it was resolved that the cost of the use of a private plane from non-employee relatives of MSLP officers in 2012 would be imputed to the executives. MSLP, however, filed several Commission filings in the form of Forms 10-K and Forms S-1, as well as amendments thereto, through March 2014, which failed to include perquisites related to officer spousal use of a private plane in 2012. Prosser signed these filings as a director.

5. By summer 2013, MSLP began an internal review of its records to determine the amount of undisclosed perquisites paid by MSLP to its executives since 2010. MSLP's CFO began this review and in July identified over $100,000 of undisclosed perquisites, including jet use, autos, and golf club memberships and informed Prosser of the amount of undisclosed perquisites located to date.

6. In July 2013, the audit committee, with Prosser as its chair, became directly involved in MSLP's perquisite review process. MSLP hired an outside consultant to perform a factual review of documents and information related to potential perquisites. MSLP, however, filed a Form S-1 in August 2013 with incorrect perquisite disclosures that were identical to amounts previously disclosed before the internal review. Prosser signed this filing as a director.

7. After the August Form S-1 was filed, Prosser assisted and supervised the independent consultant in connection with his review of perquisites. Prosser also approved the independent consultant's work plan and consulted with the independent consultant during the review.

8. In December 2013, MSLP stopped using the independent consultant. The board approved and MSLP hired an internal auditor and assigned the perquisite review to the internal auditor. Prosser assisted and supervised the work of the internal auditor and consulted with the internal auditor during the review.

9. On March 31, 2014, MSLP filed its Form 10-K for the year ended December 31, 2013. Prosser approved and signed this filing. The 2013 Form 10-K included a revised executive compensation table for the years 2011-2013. In the table, MSLP set forth previously undisclosed perquisites for 2011 and 2012 totaling approximately $189,000 ($73,000 for 2011 and $115,000

for 2012). The table also disclosed approximately $130,000 of perquisites in 2013. These disclosures, however, still significantly understated perquisites paid to MSLP executives.

10. On April 14, 2014, Prosser resigned from the MSLP board, including as a member of the audit committee as its chair, and became MSLP's interim CFO.

11. On July 23, 2014, MSLP filed a Definitive Proxy Statement, which included the same deficient perquisite disclosure as the 2013 Form 10-K.

12. MSLP and its audit committee reexamined its perquisite investigation results from spring 2014 through fall 2014. On October 31, 2014, MSLP filed amended Forms 10-K for the years ended 2012 and 2013. Prosser signed these filings as the Principal Financial Officer and Principal Accounting Officer. The 2013 Form 10-K/A disclosed approximately $252,000 of additional perquisites for the years 2011, 2012, and 2013 that were not included in the 2013 Form 10-K or MSLP's July 2014 proxy statement. The 2012 Form 10-K/A disclosed approximately $37,000 of additional perquisites for 2010. In total, MSLP failed to report perquisites totaling approximately $482,000 from 2010-2013.

13. Because MSLP did not properly identify and record perquisites paid to its executives, MSLP's books, records and accounts did not, in reasonable detail, accurately and fairly reflect its transactions and dispositions of assets and its filings with the Commission were materially false and misleading.

**Violations**

14. As a result of the conduct described above, Prosser caused MSLP's violations of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, which prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing a statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

15. As a result of the conduct described above, Prosser caused MSLP's violations of Section 13(a) of the Exchange Act Rules 13a-1 and 12b-20 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act file with the Commission information, documents, and annual and quarterly reports as the Commission may require, and mandate that periodic reports contain such further material information as may be necessary to make the required statements not misleading.

16. As a result of the conduct described above, Prosser caused MSLP's violations of Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records and accounts, which in reasonable detail, accurately and fairly reflect their transactions and dispositions of assets.

IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Prosser's Offer.

Accordingly, it is hereby ORDERED that:

A. Pursuant to Section 21C of the Exchange Act, Respondent Prosser cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A), and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, and 14a-9 thereunder.

B. Respondent shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $30,000 to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717. Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Donald W. Prosser as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Thomas J. Krysa, Division of Enforcement, Securities and Exchange Commission, 1961 Stout Street, Suite 1700, Denver, CO 80294.

V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary